**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Edward Gordon WESTERDAHL,**
**III, Defendant–Appellant.**

**No. 90–30069.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 7, 1991.

Decided Sept. 23, 1991.

Rita J. Radostitz, Asst. Federal Public Defender, Eugene, Or., for defendant-appellant.

Fred N. Weinhouse, Asst. U.S. Atty., Portland, Or., for plaintiff-appellee.

Before PREGERSON, BRUNETTI and T.G. NELSON, Circuit Judges.

BRUNETTI, Circuit Judge:

Defendant Edward Gordon Westerdahl appeals from a judgment of conviction, following a jury trial, of armed bank robbery, in violation of 18 U.S.C. §§ 2113(a) and 2113(d) (1988), and carrying a firearm during the commission of a violent crime, in violation of 18 U.S.C. § 924(c) (1988). We have jurisdiction pursuant to 28 U.S.C. § 1291 (1988), and we affirm in part, reverse in part and remand.

I.

On March 12, 1987, two men robbed a First Interstate Bank in Portland, Oregon. Deputy Sheriff Leonard Smith, who was at the scene, saw the robbers enter the getaway car, a stolen Volkswagen Quantum, and saw the passenger display a weapon. Smith fired five shots into the VW, hitting the passenger; Smith believed he had also shot the driver of the vehicle.

The VW was discovered that evening in the parking garage at St. Vincent's Hospital. Gary Hottman was found dead in the car, lying across the front seats with his head against the driver's door.

The VW was examined that night by Sheriff's Office forensic expert Allan Watson, and again by FBI expert Randall Murch on March 24, 1987. Neither was informed that Deputy Smith believed that he had shot the driver of the car. However, Murch looked for other possible "blood donors" in his examination. Twelve blood samples from inside and outside the vehicle were tested and all were found to be consistent with Hottman's blood type. No samples were taken from three areas where defense expert Ray Grimsbo, a spe-

cialist in forensic science, testified that blood from the driver might be found if the driver had been shot. No bullet fragments were found in the driver's area of the vehicle.

The car was released to the owner on April 14, 1987. At that time, Westerdahl was a suspect, but was not indicted until some eight months later.

Prior to trial, Westerdahl filed a motion to dismiss the indictment for failure to preserve evidence contained in the VW or, in the alternative, to suppress all evidence taken from the VW. The court granted the motion to dismiss. On appeal by the government, we reversed and remanded for reconsideration in light of *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). 879 F.2d 866. Based on *Youngblood*, the district court reinstated the indictment, 727 F.Supp. 1364, and subsequently granted the motion to suppress.

At trial, David Simpson testified pursuant to an informal immunity agreement with the government that he saw Hottman and Westerdahl together the morning of the robbery in the area where the VW was stolen. Simpson also testified that Hottman had a police scanner and a dent puller, a device which can be used to steal cars.

Gary Ivans was provided use immunity by the government. Ivans testified that on the evening of the robbery, Westerdahl came to his home and told him that he had received a phone call to "go help Hottman at St. Vincent's Hospital." Ivans further testified that Westerdahl had blood on his shirt and had a thick roll of currency with him.

Darris Tuck testified that Westerdahl had confessed to him that he committed the robbery. Tuck testified pursuant to an agreement with the government. Partly in exchange for Tuck's testimony against Westerdahl, he was not charged with 15 other counts of robbery or aiding or abetting robbery.[1]

Prior to trial, the government denied Westerdahl's request of immunity for defense witness Artie Goldsberry; the court similarly denied a motion for immunity. Westerdahl argued that immunity for Goldsberry was justified because the government had granted immunity to Ivans and Simpson, and had obtained Tuck's testimony by means of a plea bargain.

The court ruled that by granting immunity to its witnesses, while declining to immunize a defense witness, the government had not engaged in the type of misconduct which would even require an evidentiary hearing. The court refused to consider the application of the Third Circuit's theory of judicial immunity. *See United States v. Morrison*, 535 F.2d 223 (3d Cir.1976).

Goldsberry refused to testify at trial based on the fifth amendment. Pursuant to Federal Rule of Evidence 804(b)(3), defense witness Susan Otto testified that Goldsberry stated to defense counsel in her presence that he had committed robberies with Hottman in 1987 in which dent pullers were used to steal cars, and that he had an agreement with Hottman that if Hottman ever needed help, Goldsberry should call Westerdahl. The court refused to allow Otto to testify that Goldsberry had stated "with certainty" that Westerdahl did not commit the March 12 robbery.

The jury found Westerdahl guilty on all counts and the court sentenced him to consecutive sentences of 20 years for armed bank robbery and 5 years for carrying a firearm during a crime of violence.

On appeal, Westerdahl argues that: (1) the district court's refusal to grant immunity to Goldsberry violated his due process right to a fair trial; (2) the failure of the police to preserve potentially exculpatory evidence required dismissal of the indictment under *Youngblood;* and (3) there was insufficient evidence to sustain the conviction on the count alleging the possession of a firearm during the commission of a vio-

---

1. Tuck was facing 15 felony charges throughout Washington and Oregon. Tuck entered a guilty plea in the Western District of Washington to one count of being an armed career criminal.

In addition to his testimony in Westerdahl's case, Tuck also testified in a criminal trial in Seattle. Tuck received a fifteen year sentence on the armed career criminal charge.

lent felony. We address each argument in turn.

## II.

■ Westerdahl argues that his due process right to a fair trial was violated by the government's failure to grant use immunity to proposed defense witness Artie Goldsberry.

■ A criminal defendant is not entitled to compel the government to grant immunity to a witness. *United States v. Shirley,* 884 F.2d 1130, 1133 (9th Cir.1989). We have recognized an exception to this rule in cases where the fact-finding process is intentionally distorted by prosecutorial misconduct, and the defendant is thereby denied a fair trial. *United States v. Lord,* 711 F.2d 887, 892 (9th Cir.1983).

■ In order to make out a claim for prosecutorial misconduct, a defendant must show that the evidence sought from the nonimmunized witness was relevant and that the government distorted the judicial fact-finding process by denying immunity to the potential witness. *See Jeffers v. Ricketts,* 832 F.2d 476, 479 (9th Cir.1987), *rev'd on other grounds,* — U.S. ——, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990); *Lord,* 711 F.2d at 891. If a defendant makes an "unrebutted prima facie showing of prosecutorial misconduct that could have prevented a defense witness from giving relevant testimony," we will remand the case to the district court to determine at an evidentiary hearing whether the government intentionally distorted the fact-finding process. *Id.*

■ To satisfy the first prong of the *Lord* test, a defendant need not show that the testimony sought was either "clearly exculpatory" or "essential to the defense"; the testimony need be only relevant. *See Jeffers,* 832 F.2d at 479. Goldsberry's testimony would undeniably have been relevant to Westerdahl's defense. Government witness Tuck testified that Westerdahl confessed committing the March 12 robbery. Goldsberry would have testified that Westerdahl did not commit the robbery, directly refuting Tuck's testimony. This evidence is clearly relevant to the fact-finding process.

The testimony Goldsberry would have provided was not cumulative or non-exculpatory. *See United States v. Brutzman,* 731 F.2d 1449, 1452 (9th Cir.1984); *United States v. Alessio,* 528 F.2d 1079, 1082 (9th Cir.), *cert. denied,* 426 U.S. 948, 96 S.Ct. 3167, 49 L.Ed.2d 1184 (1976). The substance of the testimony was substantiated by more than the "unsupported assertion" of Westerdahl and/or his counsel, *see Prantil v. California,* 843 F.2d 314, 318 (9th Cir.), *cert. denied,* 488 U.S. 861, 109 S.Ct. 158, 102 L.Ed.2d 129 (1988), as Otto witnessed the discussion between Goldsberry and Westerdahl's counsel in which Goldsberry stated "with certainty" that Westerdahl was not involved in the March 12 robbery. Under these circumstances, Westerdahl has met the first prong of the *Lord* test.

In the past, our decisions on prosecutorial misconduct have focused on whether the government or its agents took affirmative actions to prevent defense witnesses from testifying. *Jeffers,* 832 F.2d at 479 (prosecutor did not make threat to defense witness which caused him to invoke fifth amendment or immunize government witnesses to distort factual picture); *United States v. Paris,* 827 F.2d 395, 401 (9th Cir.1987) (evidence did not "support the proposition that the government intentionally caused DePalm to invoke his Fifth Amendment privilege"); *United States v. Patterson,* 819 F.2d 1495, 1506 (9th Cir. 1987) (defense failed to show that "prosecution created defense witness unavailability"); *United States v. Touw,* 769 F.2d 571, 573 (9th Cir.1985) (prosecutor did not threaten or mislead defense witness by stating to judge that "there will be a complaint waiting for him at the door of the courtroom" if witness testified as planned); *Lord,* 711 F.2d at 891 (prosecutor told witness that whether he would be prosecuted "depended on his testimony"); *United States v. Garner,* 663 F.2d 834, 839–40 (9th Cir.1981), *cert. denied,* 456 U.S. 905, 102 S.Ct. 1750, 72 L.Ed.2d 161 (1982) (no due process violation where defendant does not

prove that exculpatory evidence was suppressed by government). However, misconduct is not confined solely to situations in which the government affirmatively induces a witness not to testify in favor of a defendant.

Here, the government's case relied heavily on circumstantial evidence provided by the testimony of two witnesses who had been granted use immunity by the government, and one witness who testified as part of a plea bargain in which a host of felony charges pending against him were dropped. The use of this testimony, while effectively denying Westerdahl the right to contradict it with Goldsberry's testimony, may have distorted the fact-finding process, and an evidentiary hearing should have been held to determine whether the denial of use immunity for Goldsberry denied Westerdahl his due process rights.

Previously, we noted in dicta that where two eyewitnesses tell conflicting stories, and only the witness testifying for the government is granted immunity, the defendant would be denied "any semblance of a fair trial." *Brutzman,* 731 F.2d at 1452. The same situation is effectively presented here. Tuck's testimony directly conflicts with the testimony Goldsberry would have provided. For the government to grant immunity to a witness in order to obtain his testimony, while denying immunity to a defense witness whose testimony would directly contradict that of the government witness, is the type of fact-finding distortion we intended to prevent in *Lord.*

Therefore, because Westerdahl met the two prongs of the *Lord* test, an evidentiary hearing should have been held to determine whether the government intentionally distorted the fact-finding process. As the district court failed to hold such a hearing, we reverse the judgment of conviction and remand to the district court.

### III.

■ Westerdahl next argues that the failure of the police to preserve potentially exculpatory evidence in the getaway car violated his due process rights.

In *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), the Court held that the failure to preserve potentially useful evidence does not violate due process unless a defendant can show bad faith by the police. Westerdahl argues that although *Youngblood* does not specifically define whether the appropriate standard for bad faith is objective or subjective, analysis of the opinion supports the preference for an objective bad faith standard.

■ We need not determine here whether the appropriate standard under *Youngblood* is objective or subjective, for even under an objective standard, Westerdahl has not shown that the police acted in bad faith. The forensic examinations of the getaway car were done in a professional and reasonable manner. While Westerdahl questions the thoroughness of the forensic examination as to bullet trajectories, the police had no constitutional duty to perform these more sophisticated tests. *Youngblood,* 488 U.S. at 59, 109 S.Ct. at 338 ("police do not have a constitutional duty to perform any particular tests"); *see also Mitchell v. Goldsmith,* 878 F.2d 319, 322 (9th Cir.1989).

■ Returning the car to the owner after the forensic exam was also reasonable and was not done in bad faith. FBI procedure allows the release of such evidence back to an innocent party as soon as possible. The car was examined for eight to nine hours by two examiners, and twelve blood samples and six bullet fragments were obtained. One hundred and fifty photographs were taken of the car before it was released. It strains credulity to ascribe bad faith to the police in this situation, as they would hardly have knowingly destroyed evidence that could have placed the yet to be identified driver in the getaway car.

As in *Youngblood,* there was no showing in this case that the "police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." 488 U.S. at 58, 109 S.Ct. at 337. Under the facts of this case, there is no basis for a finding of bad faith under either an objective or subjective test.

## IV.

█ Finally, Westerdahl argues that there was insufficient evidence to sustain the conviction on count II of the indictment, the charge of possession of a firearm during the commission of a violent felony, in violation of 18 U.S.C. § 924(c) (1988). We review this claim to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

█ Possession of a toy or replica gun cannot sustain a conviction under § 924(c). *See United States v. Martinez–Jimenez*, 864 F.2d 664, 668 (9th Cir.), *cert. denied*, 489 U.S. 1099, 109 S.Ct. 1576, 103 L.Ed.2d 942 (1989). Here, although there was some difference of opinion among the witnesses as to the type of gun possessed by the bank robber, there is no question that the government made the necessary showing that a real firearm was possessed during the commission of the robbery. When viewing the evidence in the light most favorable to the government, we cannot say that a rational jury could not have found that the device possessed by Westerdahl was a real firearm.

## V.

Based on the above analysis, we reverse Westerdahl's conviction and remand to the district court for an evidentiary hearing. If the district court determines that prosecutorial misconduct prevented defense witness Goldsberry from giving relevant testimony, the court shall either order a judgment of acquittal or grant any government request for use immunity for Goldsberry.

We affirm as to all other assignments of error.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

THOMAS G. NELSON, Circuit Judge, concurring in part and dissenting in part.

I concur in the opinion, except for Part II, dealing with prosecutorial misconduct, from which I respectfully dissent.

As the majority points out, an exception to the rule that a defendant cannot compel the government to grant immunity to a witness exists where prosecutorial misconduct intentionally distorts the fact-finding process. In my view, no prosecutorial misconduct occurred here.

A prosecutor's refusal to immunize a defendant's proposed witness is not misconduct unless the refusal intentionally distorts the fact-finding process. Here, the government granted immunity to two of its witnesses, but refused immunity to Artie Goldsberry. However, Mr. Goldsberry did not have any dealings with, or relationship to, the immunized witnesses presented by the government. In fact, Mr. Goldsberry's testimony would not have directly conflicted with the immunized testimony, so far as counsel for Westerdahl asserts. Defendant counsel's interview of Goldsberry was described in Appellant's brief as follows:

> Mr. Goldsberry indicated that he knew both Mr. Westerdahl and Mr. Hottman [the deceased robber]. He said that he had previously been involved in bank robberies with Mr. Hottman. He had committed bank robberies with Mr. Hottman where they used dent pullers to steal cars. He said that Mr. Hottman told him if anything ever went wrong that he should contact Mr. Westerdahl. When asked whether he was involved in the March 12th robbery, Mr. Goldsberry invoked his fifth amendment right to remain silent. He said he could say "with certainty" that Mr. Westerdahl was not involved in that robbery. However, he would go no further.

Westerdahl urges his case is analogous to the hypothetical situation posited by the court in *United States v. Brutzman*, 731 F.2d 1449 (9th Cir.1984). The court there postulated a case where the government presents immunized testimony from one of two eyewitnesses, but refuses to request immunity for the other eyewitness at defendant's request as showing prosecutorial misconduct. *Id.* at 1452. However, Westerdahl's situation was much different than the example in *Brutzman*.

Westerdahl here showed a connection between Goldsberry and the deceased robber, but no material connection with the government's immunized witnesses. Nor did Westerdahl show that Goldsberry's testimony would be exculpatory or even admissible. A person may "know with certainty" many things he cannot testify to, because the testimony is hearsay, privileged, or otherwise inadmissible.

Since the United States Attorney did not know what he was being asked to give up by seeking immunity for Goldsberry, he could not be guilty of intentionally distorting the fact-finding process by refusing to seek immunity. The defense had to provide more information on which the prosecutor could base a decision. Goldsberry's unsupported and unexplained statement that he could say "with certainty" that Westerdahl did not commit the crime did not require the United States Attorney to seek immunity for him.

On this limited issue, I respectfully dissent.